**RECEIVED**

MAR 3 1 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

COMMODITY FUTURES TRADING COMMISSION

VERSUS

UFOREX CONSULTING, LLC., ET AL.

CIVIL ACTION NO. 07-0046

JUDGE DOHERTY

MAGISTRATE JUDGE HILL

## MEMORANDUM RULING

Pending before this Court is a motion to convert a previously filed motion to dismiss

pursuant to Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction), into a motion to dismiss

pursuant to Fed. R. Civ. P. 12(b)(6) (failure to state a claim upon which relief can be granted), or

alternatively, to convert the 12(b)(1) motion into a motion for summary judgment.[1] The motion was

filed by defendants UForex Consulting, LLC ("UForex") and Paulo R. Correa.[2]

### I. Introduction

Plaintiff, the Commodity Futures Trading Commission ("CFTC" or "the agency"), brought

this action under the Commodity Exchange Act ("CEA" or "the Act"), 7 U.S.C. § 1 *et seq.*, alleging

defendants solicited investments in and operated a fraudulent scheme for the purported purpose of

---

[1]The actual title of the motion is: "Defendants' UForex Consulting, LLC, a/k/a UForex, LLC, a/k/a UForexia, Ltd., and Paulo R. Correa, a/k/a Paul R. Karr, Motion to Convert their Motion for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1) Fed.R.Civ.P. to a Motion to Dismiss a Claim Pursuant to Rule 12(b)(6) Fed.R.Civ.P. or in the Alternative, a Motion for Summary Judgment Pursuant to Rule 56 Fed.R.Civ.P., and Memorandum of Law in Support Thereof." [Rec. Doc. 44]

[2]*Pro se* defendant, Mario Gacia, has filed a document stating that he adopts the Motion to Convert and the Motion for Leave to Reply, filed by the above-named defendants. [Rec. Doc. 52] For reasons that will be discussed, *supra*, Mr. Garcia's motion is **GRANTED**.

trading over-the-counter foreign currency futures contracts.[3]   As a jurisdictional prerequisite, the CFTC asserts (as it must) that the alleged scheme involved the buying and selling of "contracts of sale of a commodity for future delivery" (commonly referred to as "futures contracts" or "futures"), and futures contracts are regulated by the CEA.[4]   Specifically, the CFTC argues defendants, in the course of conducting their futures trading scheme, violated the CEA by: (1) committing "fraud by misrepresentation and misappropriation"; and (2) "making false reports." [Rec. Doc. 1, pp. 18, 20]

Defendants take the position that "[b]ecause the transactions entered into by the customers of Uforex are not contracts in foreign currency for *future delivery* and therefore not futures contracts, the CFTC acted outside of its jurisdictional bounds under the Act." [Doc. 21, p.1 (emphasis in original)]   In other words, defendants argue the CEA does not cover the type of transactions defendants engaged in which, according to defendants, are off-exchange spot transactions[5], and therefore the CFTC is without jurisdiction over this matter, as its jurisdiction extends only to futures contracts.   Consequently, defendants argue, this matter must be dismissed for failure to state a claim upon which relief can be granted.

Thus, as a threshold matter to jurisdiction, this Court must determine whether or not the transactions at issue are "contracts of sale of a commodity for future delivery" - a term which the statute does not define.   If the transactions indeed are "futures contracts," they are subject to CFTC

---

[3]According to the Complaint, the CFTC "is an independent federal regulatory agency charged with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2002) and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2005)." [Rec. Doc. 1, ¶6]

[4] The CEA authorizes the CFTC to "enjoin or restrain violations" of the CEA. 7 U.S.C. § 13a-1.

[5]BLACK'S LAW DICTIONARY 975 (6th ed.1991) defines "spot trading" as follows: "In commodities market, cash sales for immediate delivery in contrast to trading in futures.   The Chicago Mercantile Exchange defines "spot market" as: "The market in which cash transactions occur – commodities (cattle, currencies, stocks, etc.) are bought and sold for cash and delivered immediately.   *See* http://www.cme.com/glossary/S.html.

jurisdiction; if the transactions are not "futures contracts," they are beyond the scope of the CFTC's jurisdiction and regulatory authority, and this matter must be dismissed.  7 U.S.C. § 2(a)(1)(A).

## II. **Procedural History**

The CFTC filed its complaint against UForex Consulting, LLC, Paulo R. Correa and Mario Garcia on January 9, 2007.  In addition to the complaint, the agency also filed a Motion for an *Ex Parte* Statutory Restraining Order pursuant to 7 U.S.C. § 13a-1, a Motion for Preliminary Injunction and a Motion for Expedited Discovery. [Rec. Docs. 3, 4 and 5]  In support of its motion for an *ex parte* statutory restraining order, the agency filed excerpts from the deposition testimony of defendant Mario Garcia, taken on July 6, 2005, the declarations of nine UForex customers, and the declaration of Judith McCorkle, "Senior Futures Trading Investigator with the Commission's Division of Enforcement."  The following day, an *ex parte* hearing was held, and the Court granted plaintiff's *ex parte* motion for a statutory restraining order. [Rec. Doc. 10]  The order froze the assets of all defendants, and ordered defendants to preserve and provide the CFTC access to all relevant records, documents, etc.[6]  The Court deferred ruling on the motion for preliminary injunction and

---

[6] Specifically, the portion of the restraining order granting the CFTC access to relevant records provided as follows:

> IT IS FURTHER ORDERED that representatives of the CFTC be allowed immediately to inspect the books, records, and other documents of the Defendants and their agents including, but not limited to, electronically stored data, tape recordings, and computer discs, wherever they may be situated and whether they are in the possession of the Defendants or others, and to copy said documents, data and records, either on or off the premises where they may be situated.

The Order additionally provided:

> [A]ny financial or brokerage institution, business entity, or person that holds, controls, or maintains custody of any funds, assets or other property of the Defendants, or has held, controlled or maintained custody of any funds, assets or other property of the Defendants, and who receives notice of this order by any means. . . shall:
>
> . . .

the motion for expedited discovery at that time.

On January 12, 2007, a telephone conference was held with counsel for the CFTC, counsel for UForex and Paulo Correa, and defendant Mario Garcia, who appeared *pro se*. At the conference, counsel for UForex and Mr. Correa advised the Court he was of the opinion the CFTC might lack jurisdiction over this matter, but he had not yet had enough time to review the file materials. Counsel indicated he would file a motion to dismiss if he found his initial opinion to be correct. The parties agreed to extend the statutory restraining order, with some alterations, for thirty days.[7] At the close of the conference, the Court ordered the CFTC to submit a revised restraining order, it set a

---

> C.     Provide counsel for the CFTC within five (5) business days of receiving a copy of this Order, a statement setting forth:
>
>> 1.     the identification number of each such account or asset titled in the name, individually or jointly, of the Defendants, or held on behalf of, or for the benefit, of the Defendants;
>>
>> 2.     the balance of each such account, or a description of the nature and value of such assets as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and
>>
>> 3.     the identification of any safe deposit box that is either titled in the name, individually or jointly, of the Defendants, or is otherwise subject to access by the Defendants;
>
> D.     Upon the request by the CFTC, promptly provide the CFTC with copies of all records of other documentation pertaining to such account or asset, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs .
> . . .

---

[7] Specifically, the parties agreed to allow Mr. Correa to use funds obtained from the sale of his vehicle to pay for attorney fees, and to allow a monthly deposit of $3,237.50 of Mr. Correa's personal funds (which the parties agreed were legitimately earned) into his attorney's trust account to cover Mr. Correa's living expenses.

briefing scheduling for defendant to challenge jurisdiction, and it denied the motion for expedited discovery as premature.  On January 22, 2007, another telephone conference was held in response to an inquiry as to the scope of the Court's restraining order.  The Court clarified its order granted the CFTC access to and inspection of defendants' books and records, but did not allow for other types of discovery not listed in the order (specifically, depositions). [Rec. Doc. 22]  The following day, January 23, 2007, plaintiff submitted an amended statutory restraining order which the Court granted. [Rec. Doc. 19]

On January 29, 2007, UForex and Paulo Correa, filed a motion to dismiss the complaint pursuant to Fed. R. Civ. Pro. 12(b)(1), arguing the CFTC "acted outside of its jurisdictional bounds under the act," and therefore this matter must be dismissed.[8] [Rec. Doc. 21]  On January 31, 2007, defendant Mario Garcia filed an answer to the CFTC's complaint. [Rec. Doc. 24]  On February 13, 2007, plaintiff filed a memorandum in opposition to the motion to dismiss.  On April 13, 2007, a telephone status conference was held with all counsel.[9] [Rec. Doc. 29]  At the conference, the Court advised the parties of its preliminary ruling on the motion to dismiss.  Specifically, the Court advised the parties it was of the opinion the "UForex Foreign Exchange Master Agreement: Customer Agreement" (referred to as "the contract" or "the Customer Agreement"), upon which the CFTC bases its jurisdiction, indicates the transactions in question were "spot transactions," not "futures contracts," and therefore the Court intended to grant defendant's motion to dismiss this matter.  However, the Court informed counsel that due to its docket at that time, a written ruling would take some time to issue, and the Court was concerned about the hardship imposed upon defendants by

---

[8] Rule 12(b)(1) provides for a motion asserting "lack of jurisdiction over the subject matter."

[9] The Court was unable to contact *pro se* defendant Mario Garcia at the telephone numbers he had provided the Court, however, counsel for the other defendants agreed to inform Mr. Garcia of the events at the status conference.

the freezing of their assets, particularly when the Court had preliminarily determined this matter must be dismissed. [Rec. Doc. 29]

On April 18, 2007, another telephone status conference was held with all counsel and Mario Garcia. At that conference, the Court instructed the parties that "in light of its preliminary ruling . . . , should defendants choose to do so, the Court will entertain a motion to dissolve the statutory restraining order previously entered in this matter." [Rec. Doc. 31] On April 23, 2007, UForex and Correa filed such a motion, and that motion was granted on May 4, 2007.

On July 12, 2007, the Court held another telephone conference to discuss the pending motion to dismiss. At that conference, the Court advised the parties that upon further research and reflection, it was still of the opinion the CFTC lacked jurisdiction to regulate the transactions at issue in this matter, but the Court had found the motion to be procedurally defective. Specifically, the Court stated it was of the opinion subject matter jurisdiction does exist in this matter pursuant to 28 U.S.C. § 1345 ("United States as plaintiff") and 28 U.S.C. § 1331 (federal question jurisdiction). Rather, the Court advised it was of the opinion the relief which defendants sought was more appropriately brought pursuant to a 12(b)(6) motion (failure to state a claim upon which relief can be granted), as plaintiff has no regulatory authority over spot transactions or forward contracts. The Court declined to *sua sponte* convert the motion to dismiss pursuant to 12(b)(1) into a motion to dismiss pursuant to 12(b)(6), and thus advised the parties the motion would be denied. [Rec. Doc. 41][10] On August 11, 2007, a memorandum ruling and order issued in conformity with the discussion at the July 12, 2007 telephone conference. [Rec. Docs. 42 and 43]

---

[10]However, the Court indicated defendants could move to convert the 12(b)(1) motion into a 12(b)(6) motion, or, if not appropriate, a motion for summary judgment.

On August 21, 2007, UForex and Paulo Correa filed the motion now pending before this Court – the motion to convert the 12(b)(1) motion into a 12(b)(6) motion, or alternatively, into a motion for summary judgment. [Rec. Doc. 44] On October 5, 2007, *pro se* defendant Mario Garcia filed a document which appears to be his attempt to adopt the motion to convert filed by the other defendants. [Rec. Doc. 52] All briefing has now been completed, and the motion has been taken under advisement by the Court.

## A.    Motion to Convert

In the present motion, defendants move to convert their previously filed motion to dismiss pursuant to Rule 12(b)(1), into a motion to dismiss pursuant to Rule 12(b)(6), or alternatively, a motion for summary judgment pursuant to Rule 56.  In response, plaintiff argues under either standard the motion should be denied, but ultimately argues summary judgment is the appropriate procedural vehicle in this matter. [Rec. Doc. 46, p. 3]   Plaintiff then paraphrases the sections of the CEA which grant the CFTC jurisdiction over certain commodity futures contracts, and concludes as follows:

> Given that the Defendants actually misappropriated customer funds rather than invest them in legitimate trading activity, the focus of the jurisdictional analysis is on what types of contracts were offered to - as opposed to executed by - Uforex's customer.
>
> Here, there are genuine issues of material fact.  For example, there is a factual/legal dispute, which requires further discovery, on the questions of whether certain transactions at issue were futures contracts, and, consequently, whether the activities of the Defendants concerning those transactions are subject to Commission jurisdiction with respect to the UForex contract, there are genuine issues of material fact concerning fungibility or right of offset, and whether delivery ever actually occurred.
>
> Additionally, there is a factual dispute as to whether Defendants defrauded the public.  The CFTC has not taken Correa's deposition or received confirmation that all documents relevant to an investigative subpoena issued to him for documents and testimony on October 21, 2004 or all documents required by the Statutory Restraining Order have been produced.  (See subpoena attached as Ex. A).

Specifically, other than account closing statements prepared by defendants that were provided to customers in October 2004, the CFTC has not received any documentation of commissions, fees or other trading costs. Further, other than the Customer Agreement, Defendants have not produced any documentation regarding the delivery of foreign currency, namely, their ability to make or take delivery, as required by the CFTC's subpoena. Finally, Defendants have not produced any documents from ActForex or Forex Direct Dealers, which Defendants claimed acted as clearing facilities for UForex's trading orders. (*See* Declaration of Judith McCorkle ("McCorkle") ¶ 24 filed on January 9, 2007). Applying this standard to this case there are genuine issues of material fact. Whether the transactions at issue here are futures contracts, and whether Defendants defrauded the public. Therefore, defendants' motion to dismiss should be denied in its entirety.

[Id. at 5-6]

Defendants replied, arguing this matter can and should be decided pursuant to the standard for Rule 12(b)(6), because the factual allegations contained in the complaint (as opposed to the conclusory allegations), even if true, are insufficient to grant the CFTC jurisdiction over this matter, particularly when one also looks to the UForex Customer Agreement.[11]  Alternatively, defendants argue should the Court convert the motion to a motion for summary judgment, the CFTC's plea for more discovery is unjustified and unwarranted.  Defendants point out:

> On or about September, 2004, the CFTC embarked on an extensive investigation of Uforex and Correa's business dealings, detailed in its Senior Futures Trading Investigator, Judith McCorkle's Declaration dated January 4, 2007 and referenced in the Plaintiff's Brief in Support of its Motion for Injunctive and Other Equitable Relief and for Civil Monetary Penalties under the Commodity Exchange Act. The plaintiff compiled volumes of documents from Uforex responsive to their October 21, 2004 Subpoena.   The plaintiff further extracted additional substantive information from co-defendant Mario Garcia's testimony taken on July 6, 2005 and the declarations of multiple Uforex customers.  Every document, which the CFTC believed would support its position that the contracts in play were "futures contract" [sic] undoubtably, have been furnished to the Court and are part of the record.

---

[11]The Customer Agreement is heavily relied upon and referenced in the Complaint, and therefore it may be considered by the Court in spite of Rule 12(b)(6)'s general prohibition against looking to matters outside the pleadings. *See e.g.* <u>Kane Enterprises v. MacGregor (USA), Inc.</u>, 322 F.3d 371, 374 (5th Cir. 2003).

Yet despite its three-year head start, the CFTC still complains it needs more (Response p.6). This strategy is only designed to drag out this costly litigation interminably. The defendants have produced what they have in response to the Order for expedited discovery (not to mention the production during the investigation), with no complaint from the plaintiff that it did not receive all that the defendants had to give. When added to the three years of intensive investigatory discovery that preceded this action, it is hard to digest the need for more.

Plaintiff's attempt to bootstap [sic] its contention that the contracts in question were futures by incessant references to the alleged fraud cannot convert this litigation to a matter for which the CFTC can sustain a claim. This continues to be irrelevant as the viability of the Plaintiff's Complaint depends on whether the contracts between Uforex and its many customers were futures contracts and not on whether Uforex committed fraud. There are no remaining issues of fact to be decided. The matter of whether the contracts in question are futures or spot contacts, is ripe for determination. The Court preliminary conclusion should not change. All the information is in. The transactions in question were "spot" and not "futures" contracts.

[Id. at 2-3]

As plaintiff does not object to the *procedural* aspect of defendants' motion in its brief (i.e. the "conversion" of the previous motion into either a 12(b)(1) motion or a motion for summary judgment)[12], but rather only the substance, and because the Court finds good cause exists to convert the previously filed 12(b)(1) motion, the Court hereby **GRANTS** defendants' motion to convert. [Rec. Doc. 44] As such, the previously filed motion to dismiss pursuant to Rule 12(b)(1) is hereby **CONVERTED** to a motion to dismiss pursuant to Rule 12(b)(6), or alternatively, a motion for summary judgment. Additionally, this Court's previous Order, which denied defendants' Motion for Leave to File a Reply Memorandum (in connection with the 12(b)(1) motion) [Rec. Doc. 28] is hereby **RESCINDED**, and leave is hereby **GRANTED**.[13]

_____

[12]The Court notes plaintiff does state in its conclusion the motion to convert should be denied. However, no legal authority or argument is presented in support of this position.

[13]In the Court's previous ruling, it denied the Motion for Leave for the following reason: ". . . the Court finds the underlying motion to dismiss was not made pursuant to the proper procedural vehicle, and therefore the Court declines to reach the merits of this matter, which the reply memorandum

### 1.    Standard for Motion to Dismiss Pursuant to Rule 12(b)(6)

A motion to dismiss an action for failure to state a claim upon which relief can be granted "admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts." Tel-Phonic Services, Inc. v. TBS International, Inc., 975 F.2d 1134, 1137 (5th Cir. 1992). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957). "The plaintiff's complaint is to be construed in a light most favorable to the plaintiff, and the allegations contained therein are to be taken as true." Oppenheimer v. Prudential Securities, Inc., 94 F.3d 189, 194 (5th Cir. 1996). "At the same time, a plaintiff must plead specific facts, not mere conclusional allegations, to avoid dismissal for failure to state a claim." Kane Enterprises v. MacGregor (USA), Inc., 322 F.3d 371, 374 (5th Cir. 2003)(citing Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000)). "We will thus not accept as true conclusory allegations or unwarranted deductions of fact." Id. (internal quotations omitted)

The general rule when deciding a Rule 12(b)(6) motion is that if matters outside of the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment pursuant to Rule 56.[14] FED. R. CIV. P. 12(b); *see also* Clark v. Tarrant County,

---

addresses. [Rec. Doc. 42, p.2]

[14] In this matter, the CFTC has presented matters outside of the pleadings.  When discussing the standard for a 12(b)(6) motion, plaintiff states:

> In light of this very high standard that Correa and UForex must overcome, combined with the overwhelming weight of evidence presented in support of the Plaintiff's claims, in Plaintiff's Opposition Motion, and in the Plaintiff's Memorandum of Points and Authorities In Support of Its Motions For An *Ex Parte* Statutory Restraining Order and Preliminary Injunction, filed with the Court on January 9, 2007, including all the attachments, exhibits and supplements thereto, Correa and Uforex's

Texas, 798 F.2d 736, 745 (5th Cir. 1986).  One exception to the general rule is that "the Court may

review the documents attached to the motion to dismiss . . . where the complaint refers to the

document and they are central to the claim."  Kane Enterprises at 374.  If matters outside the

pleadings are presented but not excluded by the Court, all parties must be given notice and a

reasonable opportunity to respond as provided for in Rule 56.  Clark at 745.  Rule 56(c) requires the

nonmovant have 10 days within which to respond to the summary judgment motion.  That

requirement has been interpreted by the Fifth Circuit as follows:

> Under Rule 56 it is not necessary that the district court give ten days' notice after it
> decides to treat a Rule 12(b)(6) motion as one for summary judgment, but rather after
> the parties receive notice that the court could properly treat such a motion as one for
> summary judgment because it has accepted for consideration on the motion matters
> outside the pleadings, the parties must have at least ten days before judgment is
> rendered in which to submit additional evidence." The proper question, therefore, is
> whether Washington had ten days' notice after the court accepted for consideration
> matters outside the pleadings.
>
> . . . At least from the date Washington himself submitted to the court matters outside
> the pleadings, June 10, Washington was on notice that the trial court could treat the
> motion to dismiss as a motion for summary judgment. As the Isquith court noted, the
> notice required is only that the district court could treat the motion as one for
> summary judgment, not that the court would in fact do so. 847 F.2d at 195. The
> Supreme Court has recently observed that "district courts are widely acknowledged
> to possess the power to enter summary judgment sua sponte, so long as the losing
> party was on notice that she had to come forward with all of her evidence." Celotex
> Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).
> The notice provisions of Rule 12(b) and Rule 56 were not violated.

Washington v. Allstate Ins. Co., 901 F.2d 1281, 1284 (5th Cir. 1990)(internal edits omitted).

### 2.      Standard for Motion for Summary Judgment Pursuant to Rule 56

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory

---

Motion should be denied.

[Rec. Doc. 46, p. 4]

judgment is sought may, at any time, move with or without supporting affidavits for a summary

judgment in the party's favor as to all or any part thereof." FED. R. CIV. PROC. 56(b).  Summary

judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, *an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.*  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e)(emphasis added).

As summarized by the Fifth Circuit in <u>Lindsey v. Sears Roebuck and Co.</u>, 16 F.3d 616, 618

(5th Cir. 1994)(emphasis added):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). *However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.* Id. at 322; *see also*, <u>Moody v. Jefferson Parish School Board</u>, 2 F.3d 604, 606 (5th Cir.1993); <u>Duplantis v. Shell Offshore, Inc.</u>, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

The plain language of Rule 56(c) <u>mandates</u> the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

. . . .

          . . . In ruling upon a Rule 56 motion, "a District Court must resolve any
factual issues of controversy in favor of the non-moving party" only in the sense that,
where the facts specifically averred by that party contradict facts specifically averred
by the movant, the motion must be denied. That is a world apart from "assuming"
that general averments embrace the "specific facts" needed to sustain the complaint.
As set forth above, Rule 56(e) provides that judgment "shall be entered" against the
nonmoving party unless affidavits or other evidence "set forth specific facts showing
that there is a genuine issue for trial." The object of this provision is not to replace
conclusory allegations of the complaint or answer with conclusory allegations of an
affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no
genuine dispute as to a specific fact essential to the other side's case to demand at
least one sworn averment of that fact before the lengthy process of litigation
continues.

Lujan v. National Wildlife Federation, 497 U.S. 871, 884, 888-89 (1990)(quoting Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986)).

       The Fifth Circuit has further elaborated:

          [The parties'] burden is not satisfied with 'some metaphysical doubt as to the
       material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by
       only a 'scintilla' of evidence.  We resolve factual controversies in favor of the
       nonmoving party, but only when there is an actual controversy, that is, when both
       parties have submitted evidence of contradictory facts.  We do not, however, in the
       absence of any proof, assume that the nonmoving party could or would prove the
       necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical
       evidence is so weak or tenuous on an essential fact that it could not support a
       judgment in favor of the nonmovant.

Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)(citations and internal

quotations omitted).

       Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility

determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing

all the evidence, the court must disregard all evidence favorable to the moving party that the jury is

not required to believe, and should give credence to the evidence favoring the nonmoving party, as

well as that evidence supporting the moving party that is uncontradicted and unimpeached." Roberts

-13-

v. Cardinal Servs., 266 F.3d 368, 373 (5th Cir. 2001).

### 3. Applicable Standard in this Matter

In this matter, interpretation of the Customer Agreement is crucial to each parties' respective argument. Although not explicitly referenced by name in the complaint, the Customer Agreement is the bases for plaintiff's allegation that the transactions involved herein were futures transactions. It would seem this fact alone would be sufficient to treat the motion as a motion to dismiss pursuant to 12(b)(6). However, in connection with the pending motion, the Court reviewed (again) the evidence provided in support of plaintiff's motion for an *ex parte* statutory restraining order. Therefore, out of an abundance of caution, the Court will treat the pending motion as a motion for summary judgment.[15] [16]

The CFTC suggests in its opposition memoranda that "further discovery" is warranted. [Rec. Doc. 46, pp. 5-6; Rec. Doc. 25, p.7] The Court finds that argument to be without merit. Plaintiff has never moved for a continuance in order to conduct additional discovery, as required by FED. R. CIV. P. 56(f). As noted in Potter v. Delta Air Lines, Inc., "Rule 56 does not require that any discovery take place before a motion for summary judgment can be granted; if a party cannot adequately defend such a motion, Rule 56(f) is his remedy." Potter, 98 F.3d 881, 887 (5th Cir.

---

[15]While it has no bearing on the Court's decision to treat the motion as a summary judgment motion, the Court merely notes had it treated the pending motion as a 12(b)(6) motion, *pro se* defendant, Mario Garcia, would likely be unable to join in the motion, as he has already filed an answer in this matter. FED. R. CIV. P. 12(b); *but see also* S.E.C. v. AMX, Intern, Inc., 7 F.3d 71, 75 (5th Cir. 1993) (*pro se* litigants are subject to less stringent standards than those represented by counsel).

[16]Additionally, the Court notes the agency has been on notice since at least February 13, 2007, that this matter may be treated as a summary judgment motion, as the agency itself suggested summary judgment was the appropriate mechanism by which the motion should be evaluated. [Rec. Doc. 25, pp. 5-6] *See* § II(A)(1), *infra*

1996)(internal quotations and edits omitted).[17]  As noted by another court:

> The protection afforded by Rule 56(f) is an alternative to a response in opposition to summary judgment under Rule 56(e) and is designed to safeguard against a premature or improvident grant of summary judgment.
>
> To obtain a Rule 56(f) continuance, the nonmovant must present specific facts explaining his inability to make a substantive response as required by Rule 56(e) and by specifically demonstrating how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.  The nonmovant may not simply rely on vague assertions that discovery will produce needed, but unspecified, facts.
>
> . . .
>
> Assuming, without deciding, that Washington's request for discovery in his supplemental memorandum constituted a request for a Rule 56(f) continuance, we find that the trial judge did not abuse his discretion in denying the request. Rule 56(f) may not be invoked by the mere assertion that discovery is incomplete; the opposing party must demonstrate how the additional time will enable him to rebut the movant's allegations of no genuine issue of fact.

Washington v. Allstate Ins. Co. 901 F.2d 1281, 1285 (5th Cir.1990)(internal quotations and citations omitted).

As already stated, in this matter, the CFTC has not sought a continuance pursuant to Rule 56(f).  Even were this Court to assume plaintiff's statements in its memoranda that additional discovery is warranted constitute a request for a Rule 56(f) continuance, that request would still be denied.  The CFTC has set forth no genuine issues of material fact, which can only properly be resolved at trial; nor has it set forth "how the additional time will enable [it] to rebut the movant's allegations of no genuine issue of fact."  Id.  Instead, the CFTC merely makes vague allegations in its brief that because defendants "challenge the facts as presented by the Commission in its

---

[17]The Potter court held plaintiff's argument that the trial court abused its discretion by not allowing adequate time for discovery was without merit, as plaintiff never moved for a continuance under Rule 56(f).

Complaint," there now exists the need to conduct additional discovery. [Rec. Doc. 25, p.10; *see also* Rec. Doc. 46, pp. 5-6] Although plaintiff labels various statements from defendants brief as "challenging" the facts presented in the Complaint, that simply is not the case; rather, defendants assume the truthfulness of plaintiff's factual allegations, but challenge plaintiff's legal interpretation of those facts. Again, plaintiff must always be cognizant of its burden: "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." Celotex at 322. Plaintiff has failed to carry that burden.

Moreover, in spite of the "technical" reasons for denying additional discovery noted above, plaintiffs are not entitled to "further discovery" due to the enormous amount of discovery already conducted. Plaintiff began administratively investigating this matter as early as October 2004, as evidenced by a certified letter from Judith McCorkle ("Senior Futures Trading Investigator" with the agency's Division of Enforcement) to counsel for UForex and Mr. Correa. [See Rec. Doc. 46, Ex. A] The letter states in pertinent part:

> Enclosed is a subpoena with attachment, requiring UForex, LLC to produce to the Commodity Futures Trading Commission the information specified in the attachment to the subpoena, at or before 4:00 p.m. on **November 10, 2004**.
>
> . . .
>
> If your client elects to mail the subpoenaed material rather than deliver them [sic] in person . . . the production must be accompanied by a sworn affidavit authenticating the materials and certifying that the production is complete. . . . If the affidavit is incomplete, or additional information is needed, UForex, LLC may be required to produce a representative to appear and testify.

[Id. (emphasis in original)] The enclosed subpoena ordered defendants to produce the following:

1.      All customer agreements, opening account documents and account statements for all UForex, LLC customers.

-16-

2.   A list of company officers, directors and managers and all individuals involved in the solicitation, acceptance of orders, servicing and supervision of each UForex, LLC customer account since January 2002.

3.   All document describing or relating to UForex, LLC's foreign currency trading customer qualification standards.

4.   All documents describing or relating to the foreign currency price spread, mark-up, point or PIP applied or charged to each UForex, LLC customer.

5.   All documents describing the value in dollars of one point, or one PIP.

6.   All documents reflecting or relating to all accounts UForex, LLC uses or has established to hedge or cover any exposure it assumes in its business as a foreign currency counter- party.

7.   All documents describing or relating to, the lot size, price of a lot size, of foreign currencies or other commodities offered under UForex, LLC's foreign currency trading programs.

8.   All promotional material UForex, LLC has published or disseminated to customers or potential customers.

9.   All ledgers, summaries or reports used by UForex, LLC to determine its foreign currency exposure and hedge needs.

10.   All ledgers or check registers and bank statements for UForex, LLC's customer funds segregation account(s) or operating account(s).

11.   Any and all correspondence between UForex, LLC and any customer, client, or prospective customer or client, including but not limited to, any and all customer complaints.

12.   Any and all bank records and/or other documents reflecting or relating to any active or inactive bank account name(s) and bank account number(s) owned or controlled by UForex, LLC.

13.   Any and all documents reflecting or relating to commissions or other fees that UForex, LLC charges or has charged its customers or receives from any third parties in connection with customer foreign currency trading.

14.   All documents describing or relating to the rights and obligations of UForex, LLC and its customers in connection with foreign currency trading.

15.   All documents reflecting or relating to UForex, LLC's delivery of foreign

currency to any customer or its ability to make such delivery to customers.

16.     All documents reflecting or relating to any customer making delivery of foreign
        currency to UForex, LLC or any customer's ability to make such delivery to
        UForex, LLC.

The Court additionally notes that in connection with the CFTC's *ex parte* motion for a statutory

restraining order, it submitted two rather large volumes of exhibits to the Court, which included the

declaration of Judith McCorkle, excerpts of the deposition testimony of Mario Garcia taken on July

6, 2005, and the declarations of nine UForex customers. The agency was then granted additional

access to defendants' documents by this Court, pursuant to the statutory restraining order.  After all

of the discovery completed to date, if more truly were required, plaintiff certainly should have been

able to make specific, assertions of *material* facts in dispute. [18]  Consequently, plaintiff's request for

additional discovery is **DENIED**.[19]

### III. Plaintiff's Allegations

The CFTC alleges that from approximately January 2002 until November 2004 defendants,

Paulo Correa ("individually, doing business as, and as the controlling person of UForex Consulting,

LLC") and Mario Garcia, "fraudulently solicited and accepted over $3.7 million from at least 127

retail customers for the purported purpose of trading over-the-counter foreign currency futures

---

[18]The Court additionally notes plaintiff was allowed to obtain these declarations without the
burden of having opposing counsel present.  Under such circumstances, one would presume plaintiff was
able to obtain the best testimony possible in support of its case, and the probability it will obtain more
favorable testimony would likely be diminished in an adversarial context.

[19]*See* Fisher v. Metropolitan Life Ins. Co., 895 F.2d 1073, 1078 (5th Cir. 1990)("It is the
established law of this circuit that a plaintiff's entitlement to discovery prior to a ruling on a summary
judgment motion may be cut off when, within the trial court's discretion, the record indicates that further
discovery will not likely produce facts necessary to defeat the motion."); *and* Washington v. Allstate Ins.
Co., 901 F.2d 1281, 1285 (5th Cir. 1990)("This court has long recognized that a plaintiff's entitlement to
discovery prior to a ruling on a motion for summary judgment is not unlimited, and may be cut off when
the record shows that the requested discovery is not likely to produce the facts needed by the plaintiff to
withstand a motion for summary judgment.")

contracts that purportedly cleared through Aroz International, Inc. ("Aroz"), a company controlled by Correa. [Rec. Doc. 1, ¶ 1][20] UForex' customers incurred approximately $2,900,000 in losses on their investments. [Id.]  According to plaintiff, Mr. Correa misappropriated at least $2,000,000 of his customers' funds for his personal use and transferred $188,857 to Mr. Garcia. [Id. at ¶¶ 1, 25, 26]

Of the $3.7 million solicited from customers, the CFTC alleges only $570,000 was actually used by defendants to speculate in and trade foreign currency.  The CFTC states the trading occurred during a two month period, wherein Mr. Correa lost $225,083 prior to reappropriating the balance for his personal use. [Id. at ¶ 29] The CFTC also alleges that from "at least January 2002 through September 2004, UForex issued monthly statements to its customers which falsely reported that their funds were actively traded and earning between 7% and 35% per month." [Id. at ¶ 31]  The CFTC additionally asserts that defendants did not disclose Mr. Garcia's fee arrangement, whereby he would receive 20% of a customer's initial principal and 10% of any additional funds the customer entrusted to UForex." [Id.]

On October 21, 2004, the CFTC issued an administrative subpoena to defendants and Aroz. [Id.] According to plaintiff, shortly thereafter, Mr. Correa and UForex issued letters to their customers, stating in part:

> UForex's management has determined to close down the trading account [because] the trading has, by and large, not been profitable and we were under the belief that currency trading was not regulated by any government agency.  As of late, however, certain government agencies appear to be asserting regulatory authority over this type of business.

[Id. at 31]

---

[20]According to plaintiff, at least twenty of the customers reside in the Western District of Louisiana. [Id.]

Because defendants (according to plaintiff) "engaged in acts and practices cheating, defrauding or deceiving," the CFTC asserts defendants have violated 7 U.S.C. § 6b(a)(2)(i) and (iii). [Id. at ¶ 2] Additionally, because defendants "made or caused to be made false statements in connection with the confirmation of the execution of foreign currency futures transactions," they violated § 6b(a)(ii) of the Act.[21] [Id.] The CFTC states none of the defendants have ever been registered with the CFTC in any capacity, nor has UForex been designated by the CFTC as a contract market for the trading of foreign currency futures, both of which are required under the CEA. [Id. at ¶¶ 7-9; *see also* 7 U.S.C. § 6]

## IV. Development of Commodities Market

The Commodity Exchange Act "has been aptly characterized as 'a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.'" Dunn v. Commodity Futures

---

[21]7 U.S.C. § 6b(a)(2)(i) - (iii) provides in pertinent part:

It shall be unlawful . . . for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof--

(i) to cheat or defraud or attempt to cheat or defraud such other person;

(ii) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or

<u>Trading Com'n</u>, 519 U.S. 465, 468-69 (1997)(citing <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v.</u>

<u>Curran</u>, 456 U.S. 353, 356 (1982)).  As explained in <u>Merrill Lynch</u>:

> Prior to the advent of futures trading, agricultural products generally were sold at central markets.  When an entire crop was harvested and marketed within a short time-span, dramatic price fluctuations sometimes created severe hardship for farmers or for processors.  Some of these risks were alleviated by the adoption of quality standards, improvements in storage and transportation facilities, and the practice of "forward contracting" - the use of executory contracts fixing the terms of sale in advance of the time of delivery.

> When buyers and sellers entered into contracts for the future delivery of an agricultural product, they arrived at an agreed price on the basis of their judgment about expected market conditions at the time of delivery.  Because the weather and other imponderables affected supply and demand, normally the market price would fluctuate before the contract was performed.  A declining market meant that the executory agreement was more valuable to the seller than the commodity covered by the contract; conversely, in a rising market the executory contract had a special value for the buyer, who not only was assured of delivery of the commodity but also could derive a profit from the price increase.

> The opportunity to make a profit as a result of fluctuations in the market price of commodities covered by contracts for future delivery motivated speculators to engage in the practice of buying and selling "futures contracts."  A speculator who owned no present interest in a commodity but anticipated a price decline might agree to a future sale at the current market price, intending to purchase the commodity at a reduced price on or before the delivery date.  A "short" sale of that kind would result in a loss if the price went up instead of down.  On the other hand, a price increase would produce a gain for a "long" speculator who had acquired a contract to purchase the same commodity *with no intent to take delivery but merely for the purpose of reselling the futures contract at an enhanced price.*

> In the 19th century the practice of trading in futures contracts led to the development of recognized exchanges or boards of trade.  At such exchanges *standardized agreements covering specific quantities of graded agricultural commodities to be delivered during specified months in the future* were bought and sold pursuant to rules developed by the traders themselves.  *Necessarily the commodities subject to such contracts were fungible.  For an active market in the contracts to develop, it also was essential that the contracts themselves be fungible.  The exchanges therefore developed standard terms describing the quantity and quality of the commodity, the time and place of delivery, and the method of payment; the only variable was price.  The purchase or sale of a futures contract on an exchange is therefore motivated by a single factor - the opportunity to make a profit (or to minimize the risk of loss) from a change in the market price.*

Merrill Lynch at 357-58 (emphasis added; footnotes omitted).

Recognizing "the potential hazards as well as the benefits of futures trading," Congress began regulation of commodity futures exchanges in 1921, when it enacted the Future Trading Act. Id. at 361. The statute's name and scope changed on more than one occasion, eventually becoming the Commodities Exchange Act in 1936. Id. In 1974, Congress broadened the CEA's coverage to include non-agricultural commodities, and created the CFTC "to assume the powers previously exercised by the Secretary of Agriculture, as well as certain additional powers." Merrill Lynch at 366. When Congress amended the Act in 1974, it also enacted an exemption, referred to as the "Treasury Amendment," which excluded from CFTC regulation all off-exchange trading in foreign currency - that is, no transactions were covered by the CEA unless conducted on a board of trade. 7 U.S.C. § 2(ii) (1974); Dunn at 469.[22]

Following Dunn, the CEA was again amended, as part of the Commodity Futures Modernization Act of 2000, to expand the CFTC's jurisdiction. As amended, the Act now gives the CFTC jurisdiction over off-exchange "futures contracts." The statute's scope of jurisdiction currently provides:

> The Commission shall have exclusive jurisdiction . . . with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving contracts of sale of a commodity for future delivery . . . .

---

[22]As noted in Dunn, the Treasury Amendment's purpose was to clarify that the CFTC had no jurisdiction to regulate trading in foreign currencies, unless such trading was conducted on a formally organized futures exchange. According to the Senate Committee Report, "a great deal of the trading in foreign currency in the United States is carried out through an informal network of banks and tellers." The Committee believed that market was more appropriately supervised by banking regulatory agencies, rather than the CFTC. Dunn at 473-74. Although it was not the pivotal issue in Dunn, it is of interest that the Supreme Court defined the term "futures contract" (in dicta) as an agreement "to buy or sell a specified quantity of a commodity at a particular price for delivery at a set future date." Dunn at 916.

7 U.S.C. § 2(a)(1)(A).[23] The same section of the Act later provides ". . . the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that is a contract of sale of a commodity for future delivery . . ." but only if: (1) the agreement, contract or transaction is "offered to, or entered into with, a person that is not an eligible contract participant,"[24] and (2) "the counterparty, or person offering to be the counterparty" is not one of the regulated entities enumerated in the Act. 7 U.S.C. § 2(c)(2)(B).[25]

## V. Futures Contract Defined

Because the Act does not define "futures contract," yet this Court's jurisdiction is dependent on whether or not the agreements and transactions herein were futures contracts, this Court must first define precisely what constitutes a "futures contract."[26] As already noted, the CEA grants the CFTC regulatory jurisdiction over "transactions involving contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). Although the Act does not define "futures contract," it does state

---

[23]Although the broad terminology used in the statute - "contract[s] of sale of a commodity for future delivery" - could perhaps seem to encompass more than merely "futures contracts," plaintiff has not argued its jurisdiction extends beyond futures contracts, and, from this Court's review, all courts that have addressed that precise issue have found the quoted language refers solely to futures contracts. *See e.g.* CFTC v. Zelener, 373 F.3d 861, 865 (7th Cir. 2004); CFTC v. Erskine, 512 F.3d 309, 313-14 (6th Cir. 2008)

[24]As pertinent to this matter, the Act defines "eligible contract participant" as "an individual who has total assets in an amount in excess of . . . $10,000,000." 7 U.S.C. § 1a(12)(A)(xi). According to plaintiff, "The Act anticipates that wealthy or institutional investors, known as eligible contract participants, that meet certain financial criteria and that trade foreign currency futures . . . have sufficient resources to protect their own interests when entering into foreign currency transactions, and therefore their transactions fall outside the Commission's jurisdiction." [Doc. 1, ¶ 50]

[25]Neither party argues any of the defendants in this matter is a regulated entity enumerated in the Act.

[26] It appears the Fifth Circuit has not defined the term. (In fact, there is very little Fifth Circuit jurisprudence addressing the CEA.) However, as previously noted, the Supreme Court, prior to the repeal of the Treasury Amendment and expansion of the CFTC's jurisdiction, defined a "futures contract" (in dicta) as an agreement "to buy or sell a specified quantity of a commodity at a particular price for delivery at a set future date." Dunn at 916.

"the term 'future delivery' does not include any sale of any cash commodity for deferred shipment or delivery." In other words, the Act does not purport to grant the CFTC jurisdiction over what are commonly referred to as "forward contracts." 7 U.S.C. § 1a(19); *see also* Elizabeth D. Lauzon, Annotation, *What are "Contracts of Sale of a Commodity for Future Delivery" Within Meaning of Commodity Exchange Act* (7 U.S.C.A. §§ 1 et seq.), 182 A.L.R. Fed. 559 (2002).[27]

Very recently the Sixth Circuit, in a case factually similar to the case before this Court, conducted an exhaustive examination of the jurisprudence in its quest to define the term "futures contract." The Sixth Circuit ultimately concluded "a 'futures contract' is a contract for a future transaction, while a 'forward contract' is a contract for a present transaction with future delivery." Commodity Futures Trading Com'n v. Erskine, 512 F.3d 309, 315 (6th Cir. 2008). The Erskine Court (like this Court) began its examination with a careful review of Commodity Futures Trading Com'n v. Co Petro, 680 F.2d 523 (9th Cir. 1982), a case which the CFTC vehemently argues should control in this matter.

In Co Petro, the Ninth Circuit considered a claim by the CFTC that a company named Co Petro was unlawfully engaging in the sale of "futures contracts," whereby Co Petro sold petroleum "at a fixed price for delivery at an agreed future date," but "did not require its customer to take delivery of the fuel." Co Petro at 576.

> Instead, at a later specified date the customer could appoint Co Petro to sell the fuel on his behalf. If the cash price had risen in the interim Co Petro was to (1) remit the difference between the original purchase price and the subsequent sale price, and (2) refund any remaining deposit. If the cash price had decreased, Co Petro was to (1) deduct from the deposit the difference between the purchase price and the subsequent sale price, and (2) remit the balance of the deposit to the customer.

----

[27]At the risk of stating the obvious, "spot transactions" do not fall under the definition of "futures contract" because by their very nature, spot transactions anticipate near-term or immediate delivery. *See e.g.* 182 A.L.R. Fed. 559; Black's Law Dictionary - "spot;" www.investopedia.com - "spot trade."

Id. Co Petro argued that the CFTC lacked jurisdiction over these transactions, because they were forward contracts (not futures contracts), which are expressly excluded from CEA regulation. Id. at 576-77. The court explained:

> While [CEA] section 2(a)(1) provides the [CFTC] with regulatory jurisdiction over 'contracts of sale of a commodity for future delivery,' it further provides that the term future delivery 'shall not include any sale of any cash commodity for deferred shipment or delivery.' Cash commodity contracts for deferred shipment or delivery are commonly known as 'cash forward' contracts, while contracts of sale of a commodity for future delivery are called 'futures contracts.' The [CEA], however, sets forth no further definitions of the term 'future delivery' or of the phrase 'cash commodity for deferred shipment or delivery.' The statutory language, therefore, provides little guidance as to the distinctions between regulated futures contracts and excluded cash forward contracts and, to our knowledge, no other court has dealt with this question. Where the statute is, as here, ambiguous on its face, it is necessary to look to legislative history to ascertain the intent of Congress.

Id. (citations and footnote omitted).

The Co Petro court concluded that Congress intended "that a cash forward contract is one in which the parties contemplate physical transfer of the actual commodity." Co Petro at 578. The Court looked to the parties' subjective intent, rather than the objective language in the contract, which allowed for actual delivery, and held the forward contract "exclusion is unavailable to contracts of sale for commodities which are sold merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." Id. at 579. The Co Petro court additionally found the contracts at issue were uniform, standardized agreements, which facilitated trade in those agreements (as opposed to trade in the commodity) and offsets of the agreements, all of which is "characteristic" of a futures contract. Id. at 580. Co Petro would unilaterally set the prices according to the prevailing market rates, which also facilitated trade and offsets in the agreements. Id. at 580-81. Ultimately, the court held:

In determining whether a particular contract is a contract of sale of a commodity for future delivery over which the [CFTC] has regulatory jurisdiction by virtue of 7 U.S.C. § 2 (1976), no bright-line definition or list of characterizing elements is determinative. The transaction must be viewed as a whole with a critical eye toward its underlying purpose. The contracts here represent speculative ventures in commodity futures which were marketed to those for whom delivery was not an expectation.

Id. at 581.[28]

In 1998, the Sixth Circuit considered claims by private parties, which turned on the question of whether certain grain contracts were futures contracts (and therefore covered by the CEA), or whether the contracts were cash forward contracts (and therefore excluded from CEA coverage). Andersons, Inc. v. Horton Farms, Inc., 166 F.3d 308 (6th Cir. 1998). The Andersons court, which heavily relied on the Co Petro decision, explained:

The purpose of this 'cash forward' exception [7 U.S.C. § 1a(19)] is to permit those parties who contemplate physical transfer of the commodity to set up contracts that (1) defer shipment but guarantee to sellers that they will have buyers and visa versa, and (2) reduce the risk of price fluctuations, without subjecting the parties to burdensome regulations. These contracts are not subject to the CFTC regulations because those regulations are intended to govern only speculative markets; they are not meant to cover contracts wherein the commodity in question has an 'inherent value' to the transacting parties. We hold that in determining whether a particular commodities contract falls within the cash forward exception, courts must focus on whether there is a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future.[29]

---

[28]As noted in Erskine at 316:

This case [Co Petro] became the standard for this issue and other courts followed along. Consequently, the prevailing rule, based on the Co Petro holding, focused on whether the putative purchaser had a subjective intention of actually receiving delivery of the underlying commodity - if so, it was deemed a "forward contract," but if not, it was deemed a "futures contract."

[29] The Andersons court also cited Salomon Forex, Inc. V. Tauber, 8 F.3d 966, 970-71 (4th Cir. 1993), which defined and contrasted futures contracts and forward contracts as follows:

A 'futures contract,' or 'future,' never precisely defined by statute, nevertheless has an accepted meaning which brings it within the scope of transactions historically sought to be regulated by the CEA.

Later, after further examination of other types of contracts (which are not relevant for our purposes),

the Andersons Court restated its holding as follows:

> [C]ontracts which contemplate actual physical delivery of a commodity are cash forward contracts and are therefore excluded from coverage by the CEA and CFTC regulations. "Self-serving labels" that a party may choose to give its contracts, however, are not themselves dispositive of the futures/cash-forward question: the ultimate focus is on whether the contracts in question contemplated actual, physical delivery of the commodity.

Andersons at 319-20 (citations and footnote omitted).

Following Co Petro and Andersons, Congress enacted the Commodity Futures Modernization

Act of 2000, which, as noted above, added certain commodities to the CFTC's jurisdiction, including

(under certain conditions) foreign currency.  As aptly noted in Erskine:

> While this new law, at least on the surface, renders the preceding cases distinguishable, the amendment's language about futures/forwards is the same as the pre-existing CEA language, so the reasoning of those prior cases remains pertinent. Indeed, it was not the CEA amendment that shifted the futures/forwards pedestal off its foundation, but rather the Seventh Circuit's fresh look at it in 2004 [in a matter entitled Commodities Futures Trading Com'n v. Zelener, 373 F.3d 861, 862 (7th Cir.2004)].

---

It is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed. To facilitate the development of a liquid market in these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss. The main purpose realized by entering into futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators). Since the prices of futures are contingent on the vagaries of both the production of the commodity and the economics of the marketplace, they are particularly susceptible to manipulation and excessive speculation.

In contrast to the fungible quality of futures, cash forwards are generally individually negotiated sales of commodities between principals in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity. These contracts are not readily transferable and therefore are usually entered into between parties able to make and receive physical delivery of the subject goods.

Erskine at 318.

In Zelener, the Seventh Circuit considered a claim by the CFTC (with facts quite similar to

those in this matter) that defendant Michael Zelener was unlawfully engaging in the sale of "futures

contracts," whereby Zelener sold foreign currency to casual speculators who had no intent to ever

receive possession of the foreign currency. Zelener at 862.   The CFTC alleged Zelener, like

defendants in this matter, had violated the anti-fraud provisions of the CEA.   In support of the

CFTC's position that the transactions constituted the sale of "futures contracts" (over which the

CFTC has jurisdiction), it argued:

> The CFTC believes that three principal features make these arrangements
> 'contracts of sale of a commodity for future delivery': first, the positions were held open
> indefinitely, so that the customers' gains and losses depended on price movements in the
> future; second, the customers were amateurs who did not need foreign currency for
> business endeavors; third, none of the customers took delivery of any currency, so the
> sales could not be called forward contracts, which are exempt from regulation under 7
> U.S.C. § 1a(19). This subsection reads: "The term 'future delivery' [in § 2(a)(1)(A)]
> does not include any sale of any cash commodity for deferred shipment or delivery."
> Delivery never made cannot be described as 'deferred,' the Commission submits.   The
> district court agreed with this understanding of the exemption but held that the
> transactions nonetheless were spot sales rather than "contracts ... for future delivery."
> Customers were entitled to immediate delivery. They could have engaged in the same
> price speculation by taking delivery and holding the foreign currency in bank accounts;
> the district judge thought that permitting the customer to roll over the delivery obligation
> (and thus avoid the costs of wire transfers and any other bank fees) did not convert the
> arrangements to futures contracts.

Id. at 863-64 (edits in original).   Rejecting the CFTC's argument, the Zelener court repeated the

definition of a "futures contract," as provided by that court in an earlier decision:

> "A futures contract, roughly speaking, is a fungible promise to buy or sell a
> particular commodity at a fixed date in the future. Futures contracts are fungible because
> they have standard terms and each side's obligations are guaranteed by a clearing house.
> Contracts are entered into without prepayment, although the markets and clearing house
> will set margin to protect their own interests.   Trading occurs in 'the contract,' not in the
> commodity.   Most futures contracts may be performed by delivery of the commodity
> (wheat, silver, oil, etc.). Some (those based on financial instruments such as T-bills or
> on the value of an index of stocks) do not allow delivery. Unless the parties cancel their

obligations by buying or selling offsetting positions, the long must pay the price stated in the contract (e.g., $1.00 per gallon for 1,000 gallons of orange juice) and the short must deliver; *usually, however, they settle in cash,* with the payment based on changes in the market. If the market price, say, rose to $1.50 per gallon, the short would pay $500 (50¢ per gallon); if the price fell, the long would pay. The extent to which the settlement price of a commodity futures contract tracks changes in the price of the cash commodity depends on the size and balance of the open positions in 'the contract' near the settlement date."

Id. at 864 (emphasis added)(quoting Chicago Mercantile Exchange v. SEC, 883 F.2d 537, 542 (7th Cir.1989)).  Applying the above definition to the facts in Zelener, the Zelener court concluded:

These transactions could not be futures contracts under that definition, because the customer buys foreign currency immediately rather than as of a defined future date, and because the deals lack standard terms.  AlaronFX buys and sells as a principal; transactions differ in size, price, and settlement date.  The contracts are not fungible and thus could not be traded on an exchange.

Zelener at 864.

In reply, the CFTC attempted to argue that because AlaronFX rolled forward the settlement times in practice (though not in form), the transactions were for future delivery, and therefore, fixed expiration dates and fungibility were irrelevant.  Id.[30]  As in this matter, the CFTC urged a multi-factor inquiry (or, "totality of the circumstances" test) with emphasis on "whether the customer is financially sophisticated, able to bear risk, and intended to take or make delivery of the commodity."  Id.[31]  [See also Doc. 25, pp. 6-7 ("risk transference, futurity . . ., and the opportunity for offset or delivery, as well as the totality of the circumstances" are the "characteristics that create a futures contract. . . ."]  However, the Seventh Circuit refuted this argument, explaining:

Yet such an approach ignores the statutory text.  Treating absence of "delivery" (actual

---

[30]In this matter, the CFTC "notes that a future delivery month or date is not an essential element of a futures contract." [Rec. Doc. 25, p.8 (citing Commodity Futures Trading Com'n v. International Foreign Currency, Inc., 334 F.Supp.2d 305, 312 (E.D.N.Y. 2004).

[31]As stated later in the opinion, the CFTC's multi-factor approach concentrated "on the parties' goals and sophistication, plus the likelihood that delivery will occur." Id. at 865.

or intended) as a defining characteristic of a futures contract is implausible. Recall the statutory language: a "contract of sale of a commodity for future delivery." Every commodity futures contract traded on the Chicago Board of Trade calls for delivery. Every trader has the right to hold the contract through expiration and to deliver or receive the cash commodity. Financial futures, by contrast, are cash settled and do not entail "delivery" to any participant. *Using "delivery" to differentiate between forward and futures contracts yields indeterminacy, because it treats as the dividing line something the two forms of contract have in common for commodities and that both forms lack for financial futures.*

It may help to recall the text of § 1a(19): "The term 'future delivery' does not include any sale of any cash commodity for deferred shipment or delivery." This language departs from the definition of a futures contract by emphasizing sale for deferred delivery. *A futures contract, by contrast, does not involve a sale of the commodity at all. It involves a sale of the contract.* In a futures market, trade is "in the contract." See Chicago Board of Trade v. SEC, 187 F.3d 713, 715 (7th Cir.1999); Robert W. Kolb, *Understanding Futures Markets* (5th ed.1997); Jerry W. Markham, *The History of Commodity Futures Trading and its Regulation* (1986); Louis Vitale, *Interest Rate Swaps under the Commodity Exchange Act*, 51 Case W. Res. L.Rev. 539 (2001).

In organized futures markets, people buy and sell contracts, not commodities. Terms are standardized, and each party's obligation runs to an intermediary, the clearing corporation. Clearing houses eliminate counterparty credit risk. Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn makes it possible to close a position by buying an offsetting contract. All contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place at the same time. Forward and spot contracts, by contrast, call for sale of the commodity; no one deals "in the contract"; it is not possible to close a position by buying a traded offset, because promises are not fungible; delivery is idiosyncratic rather than centralized. Co Petro, the case that invented the multi-factor approach, dealt with a fungible contract, see 680 F.2d at 579-81, and trading did occur "in the contract." That should have been enough to resolve the case.

Id. at 865-66 (emphases added). The Court then stated the policy decision behind its reasoning:

It is essential to know beforehand whether a contract is a futures or a forward. The answer determines who, if anyone, may enter into such a contract, and where trading may occur. Contracts allocate price risk, and they fail in that office if it can't be known until years after the fact whether a given contract was lawful. Nothing is worse than an approach that asks what the parties "intended" or that scrutinizes the percentage of contracts that led to delivery ex post. What sense would it make - either business sense, or statutory - interpretation sense - to say that the same contract is either a future or not depending on whether the person obliged to deliver keeps his promise? That would leave people adrift and make it difficult, if not impossible, for dealers (technically, futures commission merchants) to know their legal duties in advance. But reading "contract of

> sale of a commodity for future delivery" with an emphasis on "contract," and "sale of any cash commodity for deferred shipment or delivery" with an emphasis on "sale" nicely separates the domains of futures from other transactions.

Id. at 866. Thus, the Seventh Circuit - without expressly stating so - refuted the "anticipation of

delivery" theory espoused by Co Petro, Andersons, and other prior decisions.[32]

Citing with approval the Zelener rejection of the "anticipation of delivery" theory, the Erskine

court stated the following:

> First, the purported difference - whether or not delivery was actually anticipated - is, in reality, no difference at all because delivery is always (at least facially) promised for tangible commodities and never for intangibles, regardless of whether it is a future or a forward. Second, this approach relies on a subjective theory of contracts, in which a court must look to the parties' subjective expectations and anticipations (e.g., whether delivery is actually desired) and ignore the objective language of the contract (e.g., where delivery is expressly provided for).

> The Seventh Circuit [in Zelener] instead offered a different distinction. "A futures contract ... does not involve a sale of the commodity at all. It involves a sale of the contract. In a futures market, trade is 'in the contract.'" Id. at 865 (citations omitted). Thus, the Zelener court explained:

> > In organized futures markets, people buy and sell contracts, not commodities. Terms are standardized, and each party's obligation runs to an intermediary, the clearing corporation. Clearing houses eliminate counterparty credit risk. Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn makes it possible to close a position by buying an offsetting contract.

---

[32]As in the matter before this Court:

The Commission's principal substantive contention is that BCG deceived its clients. That could form the basis of a mail-fraud or wire-fraud prosecution, a civil or criminal action under RICO, or fraud litigation in state court. Consumers or state attorneys general could invoke consumer-protection laws as well. It is unnecessary to classify the transactions as futures contracts in order to provide remedies for deceit. Why stretch the Commodity Futures Act-with resulting uncertainty, litigation costs, and potentially unhappy consequences for other economic arrangements that may be swept into a regulatory system not designed for them-when other remedies are ready to hand?

Zelener at 867.

> All contracts that expire in a given month are identical; each calls for
> delivery of the same commodity in the same place at the same time.
> Forward and spot contracts, by contrast, call for sale of the
> commodity; no one deals 'in the contract'; it is not possible to close
> a position by buying a traded offset, because promises are not
> fungible; delivery is idiosyncratic rather than centralized. Co Petro,
> the case that invented the multi-factor approach, dealt with a fungible
> contract and trading did occur 'in the contract.'  That should have
> been enough to resolve the case.
>
> . . .
>
> Recognition that futures markets are characterized by trading
> 'in the contract' leads to an easy answer for most situations.
> Customers of foreign exchange at AlaronFX did not purchase
> identical contracts: each was unique in amount of currency (while
> normal futures contracts are for fixed quantities, such as 1,000
> bushels of wheat or 100 times the price of the Standard & Poors 500
> Index) and in timing (while normal futures contracts have defined
> expiration or delivery dates). Thus the trade was 'in the commodity'
> rather than 'in the contract.'

Id. at 865-66, 867(internal citation omitted). The Seventh Circuit concluded that "[t]hese
[foreign currency] transactions were, in form, spot sales for delivery within 48 hours.
Rollover, and the magnification of gain or loss over a longer period, does not turn sales
into futures contracts here." Id. at 869.

Erskine at 321.

Ultimately, the Erskine court concluded a "futures contract" is a contract for a future

transaction, while a forward contract is a contract for a present transaction with future delivery.  As

to a precise definition of the term "futures contract," the Court stated the following:

> Much has been made in the case law . . . of Congress's failure to define a
> "futures contract" expressly, in either the original Commodity Exchange Act or its
> amendment, the Commodity Futures Modernization Act of 2000. But, this does not mean
> that the term "futures contract" is undefined. On the contrary, many pertinent sources
> have defined "futures contract," in terms that investors and traders are expected to (and
> do) rely upon, and it is reasonable to surmise that regulators - other than the CFTC,
> apparently - would rely on similar definitions, even without express codification in a
> federal statute. Although each differs slightly from the others, the definitions, considered
> altogether, exhibit a consistent theme and typically include six common elements. Based
> on our consideration of these numerous lay definitions, we find that, in common

parlance, "futures contract" means:

(1) the "contract" is standardized so that it can be traded on an exchange, and is
(2) a fungible agreement to buy or sell
(3) a stated unit quantity of
(4) a stated commodity
(5) at a stated unit price
(6) at or before a stated future time.

It is important to recognize that it is the *agreement* or *contract* that is traded on an exchange. It is unremarkable (though easily enough mistaken as relevant) that the underlying commodity is also traded on a market exchange.

The alternative concept, i.e., "forward contract," is also defined by numerous sources, often with an emphasis on distinguishing it from a "futures contract." A "forward contract" is:

(1) neither standardized nor traded on an exchange, and is
(2) an individual agreement to buy or sell
(3) some agreed-upon quantity of
(4) some commodity
(5) at some agreed-upon price
(6) at some agreed-upon time in the future.

Thus, with a "forward contract," the underlying commodity is typically traded on a market exchange (as it typically is with a "futures contract" as well), but the *agreement* or *contract* itself is neither standardized nor traded on an exchange.

Notably, none of these definitions/distinctions [contained in the omitted footnotes] makes any mention of any anticipation of actual delivery (or lack there of). This is simply not a practical distinction. Instead, the distinction - as commonly understood - turns on the standardization and fungibility of the contract, and as the Seventh Circuit suggested, whether there is "trading in the contract," rather than trading only in the underlying commodity.

Erskine at 323-325 (citations and footnotes omitted; emphasis in original)[33]

This Court finds the Zelener and Erskine decisions to be more persuasive than Co Petro and

---

[33]Although the Court has not quoted the footnotes from Erskine, it is noted the footnotes contained definitions of futures contracts and forward contracts, as found in: Merriam-Webster's Dictionary of Law (contract), Black's Law Dictionary, the Chicago Board of Trade website, the Chicago Board of Options Exchange website, Dictionary.com, WordNet 3.0, Investopdia.com, Wall Street Words, and the Chicago Mercantile Exchange website.

other cases cited by the CFTC, particularly because of the nature of the transactions involved, themselves and as the facts and issues in those cases are more closely aligned with those in the matter before this Court.  Additionally, Co Petro, as well as all other cases cited by the CFTC in support of its "totality of the circumstances test," were decided prior to the Modernization Act, with the exception of Commodity Futures Trading Com'n v. International Foreign Currency, Inc., 334 F.Supp.2d 305, 310 (E.D.N.Y. 2004).  As such, the Court will follow the analyses laid out in Zelener and Erskine.

## VI. Analysis

In this matter, the CFTC contends the transactions offered and made by defendants were "futures contracts," and therefore subject to regulation by that agency.  The CFTC makes the following arguments in support of its contention that the transactions at issue were "futures contracts":

1.  "The Supreme Court has held that a district court owes deference to an agency's reasonable interpretation of its statutes.  In contexts involving financial instruments similar to this, the federal courts have, consonant with the Commission's jurisprudence and statutory interpretations, followed the logic of CFTC v. Co Petro Marketing Group, Inc., 680 F.2d 573 (9th Cir. 1982) and avoided bright-line tests in favor of a multi-factor 'totality of the circumstances' test." [Rec. Doc. 25, p.6 (citations and footnotes omitted)]

2.  "The written customer agreement that UForex [sic] customers entered into ("Customer Agreement") incorporates a price or price formula that was established at the outset of each transaction," which is characteristic of a futures contract. [Id. at 7]

3.  The fact that "'the foreign currency transactions entered into by the customers of UForex did not have a reference to a future delivery month or future delivery date. . . [and the fact that] there was no requirement that customers of UForex were required to take delivery of the foreign currency they purchased'" is either (a) "not an essential element of a futures contract," or (b) tends to "demonstrate[] that the offered transactions were futures." [Id. at 8-9 (quoting Rec. Doc. 21, p.4)]

4.      Assuming "open customer positions were rolled over every day," which plaintiff does not concede, such a rollover created a futures contract, because it "effectively marked-to-market the customers' positions." [Id. at 9-10]

5.      "[T]he Customer Agreement promises to create offsets[34] instead of delivering the underlying currency making the offered transactions fungible, and therefore, futures. . . . [Because] delivery was not called for in the Customer Agreement . . . like futures, trading would have to occur, 'in the contract,' and not 'in the commodity.'" [Id. at 10]

6.      The UForex contracts were standardized. [Id. at 16]

## A.    Must this Court defer to the CFTC's interpretation of the term "futures contracts"?

The CFTC argues:

The Supreme Court has held that a district court owes deference to an agency's reasonable interpretation of its statutes.

In contexts involving financial instruments similar to this, the federal courts have, consonant with the Commission's jurisprudence and statutory interpretations, followed the logic of *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573 (9th Cir. 1982) and avoided bright-line tests in favor of a multi-factor 'totality of the circumstances' test.

[Rec. Doc. 25, pp. 5-6 (citations and footnotes omitted)][35]

---

[34]An offset is where an investor liquidates a futures position by entering an equivalent, but opposite, transaction which eliminates the delivery obligation, and reduces the investor's net position in an investment to zero, so that no further gains or losses will be experienced from that position. *See e.g.* Zelener at 868; www.investopedia.com/terms/o/offset.asp; the Chicago Mercantile Exchange glossary at www.cme.com/glossary/O.html.

[35]The CFTC seems to ignore the holding of the "federal court" in Zelener (as well as Erskine, although the appellate decision in Erskine issued subsequent to submission of the briefs in this matter), which impliedly (and explicitly in Erskine) rejects the CoPetro "totality of the circumstances" test, in favor of a "bright-line" test. Nevertheless, the CFTC argues the transactions herein constitute futures contracts, regardless of which test is applied.

Of additional interest, in Erskine, the CFTC argued it was error for the district court to follow the Zelener case, rather than Sixth Circuit precedent in Andersons. The Court held as follows:

We do, however, agree that Andersons is distinguishable-on the distinction between tangible and intangible commodities, inasmuch as there is never "delivery" of intangible or financial commodities. . . . Since the present reasoning - and holding - would support the same outcome as was reached in Andersons, and the present reasoning also considers

The CFTC relies on <u>Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.</u>[36] in support of its position that its interpretation of the term "futures contract" is entitled to deference, arguing: "the Commission is the agency charged by Congress to administer the Act"; "the Commission has applied and developed this test through case-by-case formal adjudication"; "the Commission alleges throughout its complaint that Defendants engaged in fraud involving the solicitation of illegal, off-exchange foreign currency futures contracts"; and "the Commission has jurisdiction to regulate transactions in foreign currency futures contracts." [Id. at 5-7]

In <u>Chevron</u>, the Court stated the "deference" analysis as follows:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.FN9 If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
>
> > FN9. The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.

[<u>Id.</u> at 843-44(citations and footnotes omitted)] The Court finds the CFTC is not entitled to <u>Chevron</u> deference on this issue. First, as will be discussed *infra*, the Court finds the transactions herein are

---

intangibles (i.e., the Modernization Act aspects) and the <u>Zelener</u> decision, we find the present reasoning superior to <u>Andersons</u> and concede that <u>Andersons</u> does not provide controlling precedent.

<u>Erskine</u> at 322.

[36]*See* 467 U.S. 837, 844 (1984)("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency" to which interpretive authority has been delegated).

not futures contracts, and "the statute, as a whole, clearly expresses Congress' intention" to include only futures contracts (and not spot or forward contracts), "administrative deference is improper." *See* Dunn v. Commodity Futures Trading Com'n, 519 U.S. 465, n.14 (1997); Dole v. United Steelworkers of America, 494 U.S. 26, 43 (1990)("Because we find that the statute, as a whole, clearly expresses Congress' intention, we decline to defer to OMB's interpretation.") Second, even were the Court to find the agency is entitled to deference, for the reasons discussed later in this ruling, the Court finds the agency's interpretation is not reasonable.[37]  See § VI(B) *infra*.

Finally, as stated in Zelener:

> Citing Chevron . . ., the Commission contends [as in the matter before this Court] that its position that rollovers turn spot sales into futures contracts should be respected without independent judicial inquiry.  Yet when deciding what is (or isn't) a "security," courts have not deferred to the SEC; there is no greater reason to defer to the CFTC when defining futures contracts.  In Dunn the Supreme Court addressed *de novo* the question whether an over-the-counter option on foreign currency was excepted under the pre-2000 version of the Treasury Amendment. . . . [T]he central point is that deference depends on delegation. *See* United States v. Mead Corp., 533 U.S. 218 (2001).  When Congress has told an agency to resolve a problem, then courts must accept the answer.  When, however, the problem is to be resolved by the courts in litigation - which is how this comes before us - the agency does not receive deference.  Adams Fruit Co. v. Barrett, 494 U.S. 638, 649-50 (1990).  Courts must heed the agency's reasoning and give it the benefit of the doubt. . . . Both Nagel and Lachmund hold that rollovers of grain sales do not turn them into futures; it is hard to see why we should treat rollovers of currency sales differently.[38]

---

[37] If the Court were to apply Chevron deference to this matter, because Congress has not "spoken to the precise question at issue" by defining what are or are not "contracts of sale of a commodity for future delivery," and because the statute does not address the issue before the Court, the question would be "whether the agency's answer is based on a permissible construction of the statute."

[38]*See also* U.S. v. Mead, 533 U.S. 217, 226-27 (2001):

> [A]dministrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.  Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a

Id. at 867.

**B.    Are the transactions at issue in this matter futures contracts?**

In this matter, UForex and its customers entered into contracts (entitled "Foreign Exchange

Master Agreement: Customer Agreement"), which offered two separate types of transactions.  The

first  type of transaction listed in the contract authorized UForex to execute currency trades on the

client's behalf:

> **AUTHORIZATION TO TRADE.** Party A [UForex Consulting LLC] is authorized to
> purchase and sell OTCFX (Over-the Counter-Foreign Exchange) for Party's account(s)
> with a counter party bank or sophisticated institutions or participants in accordance with
> Party B's [customer's] verbal or written or computer instructions.  Unless instructed by
> Party B to the contrary in writing, Party A is authorized to execute all orders with such
> banking institutions, counter party bank, or sophisticated institutional participants as
> Party A deems appropriate.

[Customer Agreement, p.1]   The second type of transaction was a "principal-to-principal

transaction," described in the contract as follows:

> Party B acknowledge [sic] that Party A is a dealer in certain Currencies.  From time to
> time, as specified hereunder, Party B may request, on a principal-to-principal basis, to
> buy or sell Currencies utilizing Party A's electronic currency dealing facilities which
> provide for execution of FX Transactions (as defined below), reporting positions in the
> Currency markets and related Trading Statement Reports (the "System").  Party B will
> pay a total round-turn (R/T) comisison [sic] per trade in the amount of US$60.00 in
> consideration of Party A entering into this Agreement and entering into and carrying FX
> Transactions.

[Id. at §1.1(a)]

---

comparable congressional intent.

*And* Erskine at 314:

> [A]t no time since 2000, when Congress enacted the CEA amendments, has the CFTC
> ever defined 'futures contract' by rule-making or in an adjudication, which would
> provide for Chevron deference, but has merely asserted its preferred definition during the
> course of litigation (and in a proposal to Congress for new legislation).  This approach
> does not result in a definition entitled to Chevron deference.")

A thorough review of the Customer Agreement reveals it contains no agreement to buy or sell a stated unit quantity of a stated commodity, at a stated unit price, at or before a stated future time, all of which are traditional elements of a futures contract.  A thorough review of the Customer Agreement also affirms defendants were not offering fungible contracts; rather, from what has been presented to the Court, customers were free to choose any quantity of foreign currency[39], no specific prices were quoted in the contract (only market prices)[40], and the contract contains no reference to future delivery.[41]  The Court finds on their face, the contracts entered into by defendants and their customers purport to conduct spot transactions, as will be more fully explained below.

However, all declarations submitted by the CFTC show that those particular customers did not conduct their own trades, but rather allowed UForex to execute trades on their behalf (as allowed by the contract).  Nothing in the submitted declarations suggests the parties should have been under the impression defendants were acting outside of the contract and were actually conducting futures trading on their behalf.  For example, in the declaration of Peter S. Bauer, he states: "After our conversation Garcia sent me a fax stating that I 'have tremendous opportunity available to make high profits in [Uforex's] managed accounts'; that UForex 'can float money in and out of any profitable global condition that is presented by the minute within four major currencies: the Euro, Yen, British

---

[39]The only limitation being "Party B shall not make any Trade Request for more than the Maximum Trade Size in a single trade for any single Currency, unless Party B has provided prior written or electronic approval which Party A may refuse in its sole discretion. . . ." [§1.3(iii)]

[40] The contract specifically notes, "Currency prices may vary from second to second and it may prove impossible to trade at indicative prices," which tends to support defendants' argument the transactions were spot transactions rather than futures contracts.

[41]In fact, the contract provides at the close of trading time on each business day, all closed positions were to be settled either by cash settlement or physical delivery.  Should the customer choose to keep their position open, it was to be rolled over to the next business day. [§§2.1(a) and (b)] Additionally, the "definitions" section of the contract contains the terms "spot contract" and "spot rate," but has no terms addressing futures trading.

Pound, and the Swiss Franc'. . . ." [Declaration ¶ 5 (emphasis added)] In the declaration of Raymond Boutte, he states: "Correa solicited me to invest with UForex by telling me that I would not lose any money because he said he was 'always profitable in trading *because he would get out of positions while the market is still climbing.*'" [Declaration at ¶ 6 (emphasis added)] Those descriptions hardly seem as though defendants gave the impression they were conducting futures transactions, as there seems to be no reference to any type of standardization involved in the trading, as described by UForex to its customers.

### 1.    Price

The CFTC argues because the customer agreement "incorporates a price or price formula that was established at the outset of each transaction, this, in part, leads to the conclusion the transactions were for futures contracts." [Rec. Doc. 25, p.7] The CFTC cites to sections 1.1(a) and 2.1(a)(ii) in support. Section 1.1(a)(principal to principal transactions) states in pertinent part: "Party B will pay a total round-turn (R/T) comisison [sic] per trade in the amount of US$60.00 in consideration of Party A entering into this Agreement and entering into and carrying FX Transactions." Section 2.1(a)(ii) states in pertinent part: "all Open Positions shall be rolled to the next Business Day and shall be charged the applicable Carry Fee." The CFTC argues these contractual provisions create a "pricing formula of an introducing price, 'the applicable carry fee' for all open positions rolled to the next business day, and the sale or offsetting price." [Id. at 8]

Although not abundantly clear, it seems the CFTC is arguing that a "carry fee" or "round-turn commission" added to the prevailing market price somehow creates a pricing formula.[42] Even if the

---

[42]Although the CFTC does not define "pricing formula," from this Court's review of the jurisprudence, a pricing formula is typically tied to some type of index - i.e. Standard & Poors 500 Index, Wholesale Price Index-Industrial Commodities, etc. The Court found no cases in its independent research where a "pricing formula" was merely market rate plus a commission fee.

Court agreed that a price determined by market rate plus a commission equals a "pricing formula," that still will not remedy the fact that no prices were established at the initiation of the contract. The evidence before the Court shows the contracts purchased were bought at a price, which would be determined by the market at the time of the purchase, and were sold, not for some fixed price in the future, but at the market price at the time of the sale. As in <u>Zelener</u>, "These transactions could not be futures contracts . . ., because the customer buys foreign currency immediately rather than as of a defined future date, and because the deals lack standard terms. . . . [T]ransactions differ in size, price, and settlement date." <u>Id.</u> at 864.

### 2.    Future Delivery

The CFTC next argues the fact that "'the foreign currency transactions entered into by the customers of UForex did not have a reference to a future delivery month or future delivery date. . . [and] there was no requirement that customers of UForex were required to take future delivery of the foreign currency they purchased'" is not essential. [Rec. Doc. 25, p. 8(quoting Rec. Doc. 21, p.4)][43]  The Court disagrees. As to the first portion of the CFTC's argument (reference to future delivery), the statute only grants the CFTC regulatory authority over "contracts of sale of a commodity for *future delivery*." As discussed in <u>Erskine</u> and <u>Zelener,</u> it is not for this Court to excise the requirement of future delivery from the statute, or to expand the statute's scope. The requirement of future delivery is a standard, customary requirement of a "futures contract."

As to the second portion of the CFTC's argument (no requirement to take delivery), this Court must again disagree and notes the language in <u>Zelener</u>:

---

[43]The CFTC relies on two district court decisions in support of this argument. *See* <u>Commodity Futures Trading Com'n v. International Foreign Currency, Inc.</u>, 334 F.Supp.2d 305 (E.D.N.Y. 2004), and <u>Commodity Futures Trading Com'n v. Clavary Currencies</u>, 2004 WL 2330725 (D.Md).

The Commission's candidate for that technical meaning [of contract for future delivery] is a multi-factor approach concentrating, as we have remarked, on the parties' goals and sophistication, plus the likelihood that delivery will occur. Yet such an approach ignores the statutory text. Treating absence of "delivery" (actual or intended) as a defining characteristic of a futures contract is implausible. Recall the statutory language: a "contract of sale of a commodity for future delivery." Every commodity futures contract traded on the Chicago Board of Trade calls for delivery. Every trader has the right to hold the contract through expiration and to deliver or receive the cash commodity. *Financial futures, by contrast, are cash settled and do not entail "delivery" to any participant.* Using "delivery" to differentiate between forward and futures contracts yields indeterminacy, because it treats as the dividing line something the two forms of contract have in common for commodities and that both forms lack for financial futures.

[Id. at 865 (emphasis added)] It would seem to be a rare occasion indeed, that a person desiring to speculate in foreign currency transactions of any kind (whether they be futures, forward or spot transactions) would actually prefer to take delivery of the foreign currency, rather than simply take a cash settlement in United States dollars.

3.      **Rollover**

The CFTC argues, assuming "open customer positions were rolled over every day," which plaintiff does not concede[44], such a rollover created a futures contract (not a spot transaction or forward contract), because it "effectively marked-to-market the customers' positions."[45] [Id. at 9-10]

_____

[44]If plaintiff's express refusal to "concede" this point is for the purpose of raising a genuine issue of material fact, the Court finds it does not. Again, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, *thus shifting to the non-monvant the burden of demonstrating by competent summary judgment proof* that there is an issue of material fact warranting trial." Lindsey at 618 (emphasis added).

[45]Again, the CFTC has failed to define this term. However, in a case cited by both parties, Bank Brussels Lambert, S.A. v. Intermetals Corp., 779 F.Supp. 741, 743 (S.D.N.Y. 1991), the court described that term as follows:

When contracts were rolled over, the gain or loss that had been incurred as the result of past price changes would not be posted to IM's account; however, by comparing the present market on any day with the price at which the position had initially been purchased, one could "mark the position to market," ascertaining exactly how much profit or loss had been incurred as the result of past price fluctuation.

The CFTC states "a rollover creates an obligation to be fulfilled at a future date by extending the date

of performance indefinitely." [Id. at 9 (citing Bank Brussels Lambert v. Intermetals Corporation, 779

F.Supp. 741, 749-50 (S.D.N.Y. 1991)]   The CFTC concludes, "Furthermore, a daily rollover

facilitates speculation in the underlying foreign currency by marking to market the account at the end

of each day, enabling Defendants to calculate the margin maintenance funds due its customers." [Id.]

Again, the Court finds the reasoning of Zelener to be persuasive on this issue:

> Any contention that it is appropriate to ignore the contract's form and focus on economic effects - here, that rollover without full payment (AlaronFX allows customers to use margin while positions are open)[46] can give the buyer the economic equivalent of a long position on a futures exchange - produces a sense of déjà vu. We've been here before, but in securities rather than commodities law. A business can be transferred two ways: the corporation may sell all of its assets, then liquidate and distribute to investors the cash received from the buyer; or the investors may sell their securities directly to the buyers. With sufficient care in drafting, these two forms may be made economically equivalent. This equivalence led to arguments that the sale of stock to transfer a whole business should not be regulated by the federal securities laws. Because the sale of assets would be governed by state contract law, it would upset expectations to handle the functionally equivalent transaction under federal law just because stock played a role. *Many courts adopted this sale-of-business doctrine, but the Supreme Court rejected it, ruling that form must be respected. See* Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985). One reason is that the securities laws are about form, and one can say much the same about the commodities laws. Another powerful reason was *the need for certainty*. The sale-of-business doctrine led to all sorts of questions. What if there were a significant minority shareholder? What if the new buyer did not plan to run the business as an entrepreneur? The list of questions turned out to be long and the uncertainty considerable - just as the CFTC's list of factors has made it hard to determine when rollovers turn spot or forward deals into futures contracts. By taking form seriously the Supreme Court was able to curtail, if not eliminate, that uncertainty and promote sensible business planning. *See also* Reves v. Ernst & Young, 494 U.S. 56 (1990) (simplifying the approach to determining when notes are securities). Since the main battle in the sale-of-business cases was whether fraud litigation would occur in state or federal court, the Justices saw no reason for prolonged litigation about the forum: fraud is illegal in every state. So, too, for the definition of futures contracts. The Commission's principal substantive contention is that BCG deceived its clients. That could form the basis of a

---

[46] As does the contract in the matter before this Court.

mail-fraud or wire-fraud prosecution, a civil or criminal action under RICO, or fraud litigation in state court. Consumers or state attorneys general could invoke consumer-protection laws as well. It is unnecessary to classify the transactions as futures contracts in order to provide remedies for deceit. Why stretch the Commodity Futures Act-with resulting uncertainty, litigation costs, and potentially unhappy consequences for other economic arrangements that may be swept into a regulatory system not designed for them - when other remedies are ready to hand?

Zelener at 866-67 (emphasis added). Like the Zelener and Erskine courts, this Court does not find

the ability to roll over spot transactions somehow converts those transactions into futures contracts.

The transactions at issue were not liquidated on the basis of a value determined at the time of

contracting, but rather, the contracts were liquidated at market value determined at the time of the

liquidation or sale. The CFTC's jurisdiction is limited to futures contracts; "[it] does not cover the

spot market, regardless of the motivation of the transactions." Commodity Futures Trading Com'n

v. Zelener, 2003 WL 22284295 at *5 (quoting Bank Brussels at 750), aff'd, 373 F.3d 861 (7th Cir.

2004).

### 4. Offsets

The CFTC argues:

Here, the Customer Agreement promises to create offsets instead of delivering the underlying currency making the offered transactions fungible, and therefore, futures. Further, as UForex and Correa concede, delivery was not called for in the Customer Agreement and therefore, like futures, trading would have to occur, "in the contract," and not "in the commodity."

[Id. at 10 (citations omitted)]

First, this statement completely mischaracterizes defendants' argument. Defendants merely

argue the contract is *silent* as to any mention of "future delivery" or a future date upon which the

contract must be bought or sold, which is an essential element of a futures contract. [Rec. Doc. 21,

p.12] Second, the portion of the contract relied upon by the CFTC [§2.1(b)] makes no promise to

create an "offset" - i.e. an equal, but opposite "futures contract". Rather, that section merely states:

> *Cash Settlement of FX Transactions.* Unless a permissible election is made for physical delivery . . ., this Section 2.1.(b) shall be applicable and the definition of FX Transactionin [sic] Section 1.1(b) shall be modified to include foreign exchange transactions for the purchase and sale of one Currence [sic] against another but which shall be settled by the delivery of one Currency based on the differences between exchange rates as agreed by the Parties. Only one Currency shall be delivered for any such FX Transaction in accordance with the formula agreed by the Parties. The Close Out Amount for any such FX Transaction shall be determined in accordance with Section 5.5 herein and shall be a Currency Obligation.[47]

Although rather poorly drafted, the above contract provision seems to be stating that unless the customer opts for physical delivery of the commodity, the customer's account will be settled (or "closed out') with a cash equivalent of the foreign currency commodity. To determine the settlement or close out amount, one looks to § 5.5 (emphasis added by the Court), which states in pertinent part:

5.5     ***Liquidation of Open Position.*** On any such date where:

    i.      Customer directs Party A to close an Open Position,

    . . .

    iii.     Party A shall . . . or may in its sole discretion . . . close-out and liquidate, the Open Positions so specified by Customer . . . . Such liquidation of Party B's position(s) in whole or in part on the Close Out Date *shall be conducted at the current market prices* available to Party A . . . . *Party A will use its best efforts to liquidate Party B's Open Positions . . . so as to minimize further losses to Party B. However, no assurances or guarantees can be given that Party A will be successful in limiting Party B's loss to any specific price or amount. . . .*

Nothing in the cited language "promises to create offsets instead of delivering the underlying currency," as argued by the CFTC. In fact, it appears the cited language argues the opposite. As previously noted, in commodities futures trading, an offset is when a futures trader liquidates a previously purchased futures contract by entering an equivalent, but opposite transaction, which

---

[47]The Court notes § 2.2(b) states in pertinent part: "IN THE EVENT SUCH ELECTION [for physical delivery of the commodity] IS NOT MADE, CASH SETTLEMENT OF FX TRANSACTIONS IN SECTION 2.1 (b) SHALL BE DEEMED APPLICABLE."

eliminates the delivery obligation and reduces the trader's net position in an investment to zero, so that no further gains or losses will be experienced from that position.  Here, the contract language cited above says nothing about purchasing an equal but opposite *futures contract* (or any other type of transaction) in order to offset any potential future losses.  Rather, the cited language states when a customer closes his position, UForex will deliver either "cash" or the commodity, or UForex may attempt to liquidate the customer's open positions, "at the current market prices available to Party A," in an effort to "minimize further losses to Party B."  Thus, if indeed the contract "promises to create offsets," as argued by the CFTC, such promise is to offset a spot transaction, because "the offset" is purchased at current market rates, not at some fixed price determined by supply and demand or other market factors.

The CFTC additionally argues:

> [Because future delivery] was never called for and not contemplated by the customers.
> . . [t]herefore, the only way out of the contract was through offset. Moreover, the
> Customer Agreement is filled with words and phrases which would lead retail customers
> to believe that they could always offset their positions instead of taking delivery.

[Id. at 13]  The Court disagrees.  First, the "only way out" of the contract was not solely "through offset."  As discussed above, the Customer Agreement explicitly provides for physical delivery of the commodity, or cash settlement.

Second, even accepting as true the agency's statement that the contract "is filled with words and phrases which would lead retail customers to believe that they could always offset their positions instead of taking delivery," that does not create a futures contract. [Id. at 13]  As an example of this implicit promise to offset, the agency argues the $60 "round turn" commission fee "implicitly represents that customers would be engaging in offsetting transactions because the commission fee is charged for both legs (i.e. the purchase and sale) as opposed to charging commissions for each leg

of the transaction." Although this appears to be a distinction without a difference, nevertheless the Court is of the opinion charging a flat fee no more creates an offset than would charging a commission, or any other method of payment for defendants' services. A $60 "round turn" commission fee certainly is not a promise to sell a new contract against which the buyer can offset the first contract. *See e.g.* Zelener at 868. The $60 round turn commission "offsets" nothing. It will always be a loss to the customer, rather than an offset, because it will always be paid to UForex in exchange for its services. Additionally, the Court finds the CFTC's argument that the Customer Agreement "implicitly promises customers the ability to offset" undercuts its argument these are futures contracts. A contract *must* be "explicit" if it is to be a futures contract - otherwise, it cannot be sufficiently "standardized," such that it can be sold on a board of trade.

### 5.       Standardization

Finally, the CFTC argues:

> [T]he contracts UForex offered were standardized, like futures contracts, which promoted their ability to work as if they were fungible. . . . Further, even if they were not standardized, which they were, standardization is not required to establish the existence of a futures contract provided there is a promise to offset as there is here.

[Rec. Doc. 25, p.16-17] Specifically, the agency argues the contracts were standardized as to "the rules for margins and other [unspecified] terms and conditions." Although the agency seems to concede "standardization is missing in terms of price and delivery date," as argued by defendants, it denies standardized prices and delivery dates are requirements of a futures contract. [Id. at 16]

As defined in the contract, "'Margin Requirement' shall mean the minimum Balance required to be maintained in each of Customer's Trading Accounts."[48] [Contract, p.10] The contract then

---

[48]As defined in Black's Law Dictionary, "margin" is "cash or collateral required to be paid to a securities broker by an investor to protect the broker against losses from securities bought on credit."

specifies the minimum margin amounts required for trades executed during "Day Trading Hours," and the minimum margin amount required for trades executed at all other times.  From this, the CFTC concludes "such initial and maintenance margin requirements are yet another characteristic of a futures contract." [Id. at 17]  While this statement may be true, it is also true that many brokerage houses require customers pay initial and maintenance margin requirements in order to trade through their facilities, even those not conducting trades of futures contracts.[49]  The use of margin does not convert the transactions in this matter from spot (or forward contracts) into futures contracts.

As to the requirements of "price," the CFTC merely repeats arguments already addressed - i.e. a pricing formula is sufficient to create a standardized price.  As previously noted, the Court finds there exists no standard price in the contract, rather price fluctuated according to prevailing market rates.  As to "delivery date," the agency argues, "although there is uncertainty as to when the delivery will occur, the commitment to deliver a commodity in the future nonetheless exists." [Rec. Doc. 25, p.18] The CFTC then qualifies "a specified delivery date is not determinative." [Id.] Notwithstanding the fact this argument appears inconsistent with the CFTC's earlier insistence that the customer's absence of expectation of delivery created, in part, a futures contract, the Court nevertheless disagrees with plaintiff.  Nothing in the contract discusses future delivery, future month, future contract, future price, etc.  The CFTC has produced no evidence in the two volumes of exhibits previously submitted to the Court showing any UForex customers were ever told they would or could take *future* delivery of the underlying currency.  Rather, all positions were either closed at the end of each business day by physical delivery or cash settlement, or they remained open and were rolled

---

[49]This fact is obvious by a brief internet search of brokerage houses conducting foreign currency spot transactions.

over to the next business day, until eventually (on some *uncertain* date) the position was closed at *prevailing market prices.*

In <u>Zelener</u>, the court compared the contracts at issue in that matter with the defining features of a futures contract - specifically, a fixed delivery date and a fixed price "at which the customer must liquidate the contract" - and concluded such features were "noticeably absent." <u>Id.</u> For similar reasons, this Court finds the contracts involved here, which appear to be quite similar to those in <u>Zelener</u>, do not involve the purchase of futures contracts; rather, the contract before this Court involves the trading of spot transactions. Like <u>Zelener</u>, this Court does not find that rolling over or offsetting of spot transactions converts them to futures contracts. As noted, the evidence before the Court reveals the price for the transactions engaged in was determined by the market at the time the commodity was bought or sold. <u>Zelener</u> at *4 (the transactions "were liquidated not on the basis of a value determined at the time of contracting, but at a market value determined at the time of sale").

## VII. <u>Conclusion</u>

In sum, the Court finds the transactions at issue lack the essential elements of a "futures contract," as that term is understood by investors in the commodities market, for the following reasons:

1.   The Customer Agreement is not sufficiently standardized such that it can be traded on an exchange[50];

2.   The Customer Agreement did not involve fungible contracts, but instead called for specific orders of a specific commodity, as determined by the customer, or UForex on the customer's behalf;

---

[50]Like in <u>Erskine</u>, "the investor could not call just any broker and say, *"I want to buy (sell that future contract, as listed on the exchange under the symbol _ ."* <u>Id.</u> at 325.

3.      There was no requirement the customer purchase a stated unit quantity[51] ;

4.      The contract was not for a stated commodity, but rather for a commodity (foreign currency) of the customer's choosing;

5.      The contract contained no stated unit price independent of the market price[52]; and finally,

6.      The price had no correlation to a stated date in the future, upon which the contract would become due.

Customers of UForex did not purchase identical contracts; each was unique in the amount of currency.  Conventional futures contracts are for fixed quantities of a specified commodity at a specified price for delivery on a specified future date.  For example, a contract may equal 5000 bushels of wheat at $3.00 per bushel (costing the investor a total of $15,000), or a contract could equal $50 multiplied by the price of the Standard & Poors 500 Index (calculated from an average of all 500 stocks comprising the index).  Additionally, each UForex contract was unique in timing. Conventional futures contracts have a defined delivery date or month.[53]  Thus, in this matter, the Court finds trading occurred in the commodity, rather than in the contract.  All of the divergences from a traditional futures contract invariably lead to the conclusion that the transactions at issue are not futures contracts.

---

[51] As stated in Erskine, "the investor could not simply say, *'I want to buy _ number of those listed futures contracts,'* each representing a sized lot of [100 or 1,000 or 10,000, etc.] units of the individual commodity." [Id. at 325]

[52] Which, according to Erskine, "would create an opportunity to exploit the difference between the futures contract price and the market price." [Id. at 325]

[53] For example, the Chicago Board of Trade wheat futures contract provides for delivery of 5,000 bushels of any of several varieties of wheat to be delivered in Chicago or any of several other specified delivery locations during March, May, July, September, or December (or settled by way of cash in lieu of delivery).

While this Court is keenly aware if the CFTC's allegations are true, the devastation caused to the victims of defendants' scheme is enormous, it is of the firm belief that, in accordance with the United States Constitution, its duty is <u>not</u> to legislate and craft a definition of a statutory term that is neither found within the statutory text itself, nor found in the jargon of the financial industry. Instead, this Court's duty is to interpret the laws Congress has enacted.  Though perhaps justice is not best served this date, the Court's hands are tied - either an agency (or department) to whom Congress' has bestowed regulatory authority over this type of activity must bring such persons to justice, or the CFTC must lobby for expansion of its regulatory authority.  However, this Court cannot create from whole cloth a new definition for the term "futures contract," which finds no support in the legislation, or in the industry where that term has a longstanding and commonly understood meaning.  As noted in the dissenting opinion in <u>Co Petro</u>:

> There is no indication . . . that Congress intended to regulate the kinds of fraud that might be involved in every private sale of goods to be delivered at a future date.

> There is an indication that Congress intended . . . to regulate the sale of 'futures' as that term is used in the trading markets of the nation.

> . . .

> Finally, if . . . Congress intended to regulate all dealing in commodities for future delivery, whatever the meaning of the words 'for future deliver' may be, such could have been done in one simple sentence.

<u>Co Petro</u> at 587-88.

Due to the foregoing, defendants' Motion for Summary Judgment is **GRANTED** in its entirety, and the complaint filed by the CFTC is **DISMISSED WITH PREJUDICE**.  The parties are to

jointly submit a judgment, approved as to form, within thirty days of receipt of this Ruling.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this 31 day of March, 2007.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE